# EXHIBIT

# B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

United States District Court
Southern District of Texas
FILED

DEC 11 2020

David J. Bradley, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| Plaintiff; | § |
| v. | § CASE NO. 7:07-cr-144-S2-008 |
| GUADALUPE HERNANDEZ, | § |
| Defendant / Movant | § |

## RENEWED MOTION SEEKING COMPASSIONATE RELEASE

Comes GUADALUPE HERNANDEZ, Movant ("HERNANDEZ"), and moves this Court for renewal of his motion seeking compassionate release. Hernandez will show his institution (FCI BEAUMONT LOW) is currently in the midst of a severe outbreak made worse by the Executive Staff's weaponization of Covid-19, thereby causing large swaths of inmates to contract the virus. Following this targeted use of a deadly virus, Ms. Cutright (Associate Warden) posted a message to the inmate bulletin board advising that the sooner everyone contracts this virus, the sooner the compound can get back to normal (i.e., no more or fewer modified operations).

## STATEMENT OF FACTS

1. Hernandez was sentenced to 360 months imprisonment on December 03, 2009, for violating 18 U.S.C. § 846, 841(a)(1), and 841(b)(1)(A). He has been incarcerated for over a decade, and later had his sentence reduced to 262 months imprisonment in light of the "Drugs Minus Two" Amendment 782.

2. Hernandez's attempts to seek home confinement through the Bureau of Prisons have been undermined by his Case Manager, Ms. S. McCowan, who continues to invade his central file and introduce false information.

## MEMORANDUM

Guadulupe Hernandez is in the midst of a 262-month sentence at FCI Beaumont Low. His institution is currently in the midst of a severe and hostile outbreak; for, the Executive Staff willfully infected larged groups of inmates on November 23, 2020. Hernandez and, at least, 20 other inmates have submitted claims to the South-Central Regional Counsel, Mr. Jason A. Sickler, raising that issue. While it is not ripe yet for review, Hernandez's Compassionate Release motion is due for a reconsideration in light of these tragic actions by staff.

Hernandez is non-violent, as this Court is well-aware. In spite of him having no past violence, his Case Manager, Ms. S. McCowan, has twice modified his Central File improperly. Moreover, as evidence of this, Ms. McCowan's supervisor, Ms. Love, went back into Hernandez's Central File and amended it to remove the improper scoring and the mention of violence (also improper). [Exhibit B]. If this wasn't enough, Ms. McCowan went back into Hernandez's Central File and AGAIN reinserted the false claim of violence. The mention of violence obliterated Hernandez's request.

Ms. Love failed to report Ms. McCowan for this repeated submission of false claims on official documents (a Classification 1 offense per the Internal Affairs, Office of Program Statement 1210.24, see §7, holding that it is against the rules to attempt to, conspire to, obstruct against, aid and abet, conceal, or fail to report any breach of duty).

Moreover, other inmates in Hernandez's Unit (SB) have had their files similarly treated by Ms. S. McCowan. Ms. Love also

3. As an initial matter, McCowan utilized the PATTERN Scoring System manifest in the wake of the First Step Act of 2018. She initially scored Hernandez as having 27 points (for a low classification), as well as having 24 points for violence. Hernandez's crime of conviction was non-violent, as well as he has had no violence since his imprisonment. [Exhibit A, 03/14/2020].

4. Later in August of 2020, Hernandez was properly scored by Building 1 Unit Manager Ms. Love. His proper PATTERN Score was determined to be 6 (for a minimum classification), and the designation (improper) of violence had been removed. [Exhibit B, 08/11/2020].

5. Then, again on September 08, 2020, Case Manager McCowan reentered Hernandez's central file and again inserted the "violence." This raised his score to 11 (for a low classification), as well as reimplemented the improper violence determination. This form contains Ms. McCowan's handwriting, which spells out, "21 841 (b)(1)(A)." [Exhibit C].

6. This is a pattern and practice of the Bureau of Prisons, FCI Beaumont Low. Over 20 inmates have filed via the tort vehicle because attempts to file administrative remedies have been prevented by Mr. M. Bevil, SA/SB Counselor. As evidence that Bevil has engaged in this previously, Hernandez directs the Court to Regional Administrative Remedy Appeal No. 1036047-R1, whereby an inmate's claims of Bevil's document mutilation were substantiated by the Regional Director of the South Central Regional Office.

7. The Regional Counsel, Mr. Jason A. Sickler, is the custodian of those tort claims. Currently, over 20 have been mailed out.

A memorandum in support is attached.

Respectfully Submitted,

*Guadalupe Hernandez*

Guadalupe Hernandez, pro se
Reg. No. 80256-079
FCI Beaumont Low
P.O. Box 26020
Beaumont, TX 77720

failed to report it when Ms. McCowan did the same thing to inmate Oscar Benitez and to inmate Kirtman, both properly memorialized in said Regional Counsel's records.

Hernandez is asking for expedited motion renewal in light of the abuses to which he has been subjected, and which deprived him of a lawful, administrative home detention consideration.

Respectfully Submitted,

*Guadalupe Hernandez*
Guadalupe Hernandez, pro se
Reg. No. 80256-079
FCI Beaumont Low
P.O. Box 26020
Beaumont, TX 77720

## DECLARATION

I, Guadalupe Hernandez, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

*Guadalupe Hernandez*
Guadalupe Hernandez, pro se

# EXHIBIT

# C



# Office of the Attorney General
## Washington, D. C. 20530

January 29, 2021

MEMORANDUM FOR ALL FEDERAL PROSECUTORS

FROM: THE ACTING ATTORNEY GENERAL

SUBJECT: Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing

The reasoned exercise of prosecutorial discretion is critical to the fairness, effectiveness, and integrity of the criminal justice system. For decades, consistent with the *Principles of Federal Prosecution*, the Department of Justice has provided guidance to federal prosecutors underscoring the importance of making careful, case-specific assessments as to what matters to investigate, which charges to bring, when to enter into plea agreements, and how to advocate at sentencing.

To ensure that prosecutors are able to exercise this discretion in pursuing justice, I am rescinding, effective immediately, the directive entitled *Department Charging and Sentencing Policy* (May 10, 2017) and reinstating the guidance articulated in *Department Policy on Charging and Sentencing* (May 19, 2010) as an interim measure before Senate-confirmed leadership is in place at the Department. The goal of this interim step is to ensure that decisions about charging, plea agreements, and advocacy at sentencing are based on the merits of each case and reflect an individualized assessment of relevant facts while longer-term policy is formulated. This interim policy supersedes any conflicting *Justice Manual* provisions.

Together we will work to safeguard the public, maximize the impact of our federal resources, avoid unwarranted disparities, promote fair outcomes in sentencing, and seek justice in every case. Thank you for your continued dedication to achieving those goals.

# SENTENCING LAW AND POLICY

An Affiliate of the Law Professor Blogs Network

# August 23, 2020

## The new death penalty: COVID has now killed more US prisoners in months than the US death penalty has in the last two decades

The UCLA Covid-19 Behind Bars Data Project has been doing a terrific job keeping an updated count, via this spreadsheet, of confirmed COVID deaths of persons serving time in state and federal facilities. As of the morning of Sunday, August 23, this UCLA accounting had tabulated 858 "Confirmed Deaths (Residents)."

This considerable number is sad and disconcerting on its own terms, but it is even more remarkable given that it amounts to more prisoner deaths than has been produced by carrying out formal death sentences in the United States for the entire period from 2001 to 2020. According to DPIC data, there were a total of 839 executions from the start of 2001 through today.

Of course, comparing capital punishment and COVID incarceration carnage is problematic in many ways. All persons executed in the US in recent times have been convicted of the most aggravated forms of murder. The majority of prisoners to die of COVID were not responsible for a death (although, as noted here, some persons on California's death row are part of the COVID prisoner death count). In a few prior posts here and here, I noted that nearly half of the early reported deaths of federal prisoners involved individuals serving time for drug crimes. Another such offender died just last week according to this BOP press release: Luis A. Velez contracted COVID in FCI Coleman this summer and died on August 18; he was only 58-year-old and had been in federal prison for five years (of a 13-year sentence) after his conviction of possession with intent to distribute meth.

Another problem with comparing capital punishment and COVID incarceration carnage relates to that correctional staff do not die from administering capital punishment, but many have died from COVID. The UCLA spreadsheet currently reports "only" 72 "Confirmed Deaths (Staff). I am pleasantly surprised that this number is not bigger, but I will be ever troubled by the thought it could have been much lower along with the prisoner death number if more aggressive depopulation efforts were taken to more the most vulnerable and least risky offenders out of the super-spreader environment that prisons represent.

A few of many prior related posts:

- The new death penalty: COVID has now killed more US prisoners in weeks than the US death penalty has in over a decade

- [The new death penalty: COVID has now killed more than 500 US prisoners and prison staff according to UCLA Law data](#)
- [The new death penalty: COVID now a leading modern killer of California inmates on death row](#)
- [From drug sentences to death sentences: documenting arbitrary and capricious drug war casualties](#)
- [Memorializing more drug war casualties: updating the federal drug sentences that COVID-19 turned into death sentences](#)

August 23, 2020 at 11:23 AM | [Permalink](#)

## Comments

Our Fuehrer has much blood on his hands. Over 170,000 dead and counting. Our great country laid low by a deranged narcissist and his enablers.

Posted by: anon1 | Aug 23, 2020 2:28:13 PM

Worth noting that that is 858 deaths out of 112468 cases with 74604 recoveries, according to the spreadsheet, for a case fatality rate among resolved cases of about 1.2%. According to Wikipedia, the US as a whole has about 165k deaths vs 3148k recoveries, for a case fatality rate among resolved cases of about 5%. So the prisoners are getting it, but they are also surviving better than the general population, likely because on average they tend to be younger.

Posted by: William C Jockusch | Aug 23, 2020 9:43:42 PM

I also sense, William, that prisoners even if asymptomatic are much more likely to be tested than the average American. This also connects to the younger general population for prisoners. Not sure this leads to a conclusion that prisoners are "surviving better," but I am sure that close study of the prisoner numbers can deepen our understanding of this dang virus.

Posted by: Doug B. | Aug 24, 2020 10:42:36 AM

Just chiming in on this thread to say that in our JAMA piece, we reported an adjusted covid death rate (adjusted for age and sex) among prisoners of 3.0x. In other words, if people in prison had the same age distribution as in society as a whole, the death rate would be three times higher. What this tells us is that younger prisoners are not protected by their youth - possibly because of the high rates of comorbidities among people who have done years in prison. In other words, being incarcerated is a major risk factor.

Posted by: Sharon Dolovich | Aug 24, 2020 11:39:41 PM

Here's the link: https://jamanetwork.com/journals/jama/fullarticle/2768249

Posted by: Sharon Dolovich | Aug 24, 2020 11:40:31 PM

Anything we should infer from the following stats?

Covid deaths to date:

South Korea 312

Japan 1,209

Vietnam 29

United States 178,000

Posted by: Michael R. Levine | Aug 26, 2020 10:25:02 AM

I fear it is only a matter of time before COVID deaths of just incarcerated people in the US will be larger than the total deaths in all of those countries combined, Michael.

I also think it notable that total US COVID deaths over the last six months is more than total homicide victims over the last decade. I will probably do a post on that reality, which I keep thinking about when folks roll out the standard law-and-order rhetoric (and I think if you focused on age of victims, COVID has likely killed more senior citizens than have died from homicide over the last quarter century).

Posted by: Doug B. | Aug 26, 2020 10:51:58 AM

# SENTENCING LAW AND POLICY

An Affiliate of the Law Professor Blogs Network

## September 13, 2020

### The new death penalty: The Marshall Project reporting COVID prisoner deaths exceed 1000

In this post back in May, I started what became a series of posts in which I noted what might be called a new kind of death penalty for prison and jail inmates in the United States: by killing many hundreds of incarcerated persons, COVID-19 has turned all sorts of other sentences into functional death sentences.  In prior postings, I have often flagged the death data from the UCLA Covid-19 Behind Bars Data Project, but today I see that The Marshall Project has updated data here showing that prisoner deaths have hit another grim milestone:

> **Deaths**
>
> The first known COVID-19 death of a prisoner was in Georgia when Anthony Cheek died on March 26. Cheek, who was 49 years old, had been held in Lee State Prison near Albany, a hotspot for the disease.  Since then, at least 1,016 other prisoners have died of coronavirus-related causes.  By Sept. 8, the total number of deaths had risen by 5 percent in a week.
>
> There have been at least 1,017 deaths from coronavirus reported among prisoners.

Of course, 1000 is just a round number and every single COVID death is individually sad and disconcerting.  I continue to hope that, somehow, we might be getting past the worst of this pandemic that has (predictably) already been so lethal for persons in and around prisons and jails.